CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2012 JUL 30 PM 4:58

DEPUTY CLERK _CB_

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| MARK CHRISTOPHER BERSET, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> ) <br> MICHAEL J. ASTRUE, ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) | CIVIL ACTION NO. <br> 5:11-CV-00194-BG <br> ECF |

## REPORT AND RECOMMENDATION

### Statement of the Case

Pursuant to 42 U.S.C. § 405(g), Plaintiff Mark Christopher Berset seeks judicial review of a decision of the Commissioner of Social Security denying his application for disability insurance benefits. The United States District Judge transferred this case to the United States Magistrate Judge for further proceedings. Pursuant to the Order of transfer, the undersigned now files this Report and Recommendation.

On March 31, 2010, Berset and a vocational expert testified at a hearing before an administrative law judge (ALJ). Berset was represented by counsel at the hearing. The ALJ determined on April 30, 2010, that Berset was not disabled because he could perform his past relevant work as a paper sales representative. The Appeals Council denied review on July 22, 2011. Therefore, the ALJ's decision is the Commissioner's final decision and properly before the court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (holding that the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for

1

review").

## Standard of Review

A plaintiff is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A) (2012).

"In evaluating a disability claim, the Commissioner conducts a five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007); *see also* 20 C.F.R. § 404.1520(a)(4) (2012). "The claimant bears the burden of showing she is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. Before proceeding to steps 4 and 5, the Commissioner must assess a claimant's residual functional capacity (RFC), defined as "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1520(a)(4); 404.1545(a)(1).

The court must affirm the Commissioner's decision unless it finds that (1) the ALJ applied an incorrect legal standard or (2) the ALJ's determination is not supported by substantial evidence. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"). "Substantial evidence is more than a scintilla but less than a preponderance and is

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

## Factual Background

Berset claims that he is disabled due to non-Hodgkin's lymphoma, peripheral neuropathy, carpal tunnel syndrome, depression, anxiety, asthma, and chronic bronchitis. (Tr. 168.) He has a college education. (Tr. 36.) After serving in the U.S. Army in Vietnam, he worked as a salesman for two paper and janitorial supply companies from January 1980 to May 2002. (Tr. 41, 154, 158, 169.) Berset has alleged that after losing his sales job in 2002, he looked for other employment and tried to start his own remodeling business. (Tr. 37, 169.) He claims that he became disabled on December 25, 2003, the approximate date that he was diagnosed with lymphoma at age 54. (Tr. 155, 168, 296, 340–42.) Scans and laboratory tests showed lymphoma in his chest, abdomen, pelvis, and bone marrow. (Tr. 407–08, 497, 507, 533, 535–38, 541–42.) To Berset's understanding, his lymphoma was caused by exposure to Agent Orange during his military service in Vietnam. (Tr. 41, 179.) The Department of Veterans Affairs concluded that Berset's lymphoma was 100 percent disabling "during active disease or treatment." (Tr. 146–47.)

Berset underwent chemotherapy approximately every three weeks from January 20, 2004 through June 22, 2004. (Tr. 498, 500, 502, 505, 509–10, 513, 515, 518.) By March 2004, Berset's oncologist, Rodolfo E. Martinez, M.D., reported that Berset was "entirely free of any peripheral lymphadenopathy[.]" (Tr. 505.) Scans the following month revealed that the nodes in Berset's chest were stable and that the nodes in his pelvis and abdomen had decreased in size. (Tr. 537.) The scans

3

also showed that "fairly extensive retroperitoneal mesenteric adenopathy" remained but had improved slightly since February 2004. *Id.* Imaging performed on June 30, 2004, revealed stable disease with no evidence of new lymphadenopathy and no metastatic disease in Berset's cervical spine. (402, 405–06, 519.) Two days later, Dr. Martinez reported that Berset was "in clinical remission." (Tr. 520.)

On July 7, 2004, Berset began a different type of cancer treatment called Rituxan, which he received approximately every three weeks through September 15, 2004. (Tr. 521–24.) Berset next received Rituxan in January 2005 and again in May 2005. (Tr. 526, 869.) In November 2005, he reported a severe cough that sometimes progressed to the point of vomiting, and a CT scan revealed a new node in his chest. (Tr. 548, 871.) Berset subsequently underwent four Rituxan treatments in one month. (Tr. 871–74.) He received a final cycle of weekly Rituxan treatments from March 29, 2006, through April 19, 2006. (Tr. 876–79.)

At his next appointment with Dr. Martinez on July 26, 2006, Berset reported that he was feeling very well, remodeling his home, and working more. (Tr. 880.) He had unremarkable follow-up appointments with Dr. Martinez in October 2006, January 2007, and May 2007. (Tr. 454–56.) However, he received treatment from other physicians for upper respiratory symptoms, acute bronchitis, asthma, allergic rhinitis, and sinusitis at least five times from March 19, 2007, to June 13, 2007. (Tr. 640–42, 644–47, 579–83.) On June 22, 2007, Berset underwent surgery for "significant nasal obstruction secondary to a deviated nasal septum and hypertrophy of the turbinates." (Tr. 387–90, 431.)

On August 2, 2007, CT scans of Berset's chest, abdomen, and pelvis revealed a stable pulmonary nodule, several stable nodes in the aorticopulmonary window, stable bilateral renal cysts,

diverticulosis, and a liver lesion thought to be a hemangioma. (Tr. 399.) Dr. Martinez examined Berset the following day and reported the following: "On today's visit, Mr. Berset comes in complaining of fatigue. It is disproportionate to anything that I can palpate. He has no peripheral lymphadenopathy. . . . His scans are entirely unremarkable." (Tr. 457.) After noting that a bone marrow biopsy and CT scans showed Berset to be in clinical remission later that month, Dr. Martinez recommended a bone marrow harvest due to the likelihood that Berset's lymphoma would return. (Tr. 46–47, 459.) On November 26, 2007, Dr. Martinez examined Berset and noted that he had "some paresthesias in the distal extremities" but was in clinical remission and "free of any peripheral lymphadenopathy." (Tr. 460.)

Berset was last insured on December 31, 2007, and must show that his disabling condition began prior to that date. (Tr. 136.); *see Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir. 2000) ("Claimants bear the burden of establishing a disabling condition before the expiration of their insured status.") (quoting *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990)).

### Discussion

Among other arguments, Berset contends that substantial evidence does not support the ALJ's step 3 finding because the record does not contain an opinion from a medical expert on the issue of equivalence to an impairment listed in Appendix 1 of the regulations governing Social Security claims. (Pl.'s Br. 5–10.) This argument has merit and requires remand. The undersigned does not reach Berset's remaining arguments.

A claimant must be found disabled at step 3 if his impairment "meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment[.]" 20 C.F.R. § 404.1520(d). Pursuant to Social Security Ruling 96-6p, "An updated medical expert opinion must

be obtained by the administrative law judge or the Appeals Council before a decision of disability based on medical equivalence [to a listed impairment] can be made." SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996). The ruling "requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence . . . must be received into the record as expert opinion evidence and given appropriate weight." *Id.* at *3.

Listing 13.05 of the regulations governing Social Security claims describes certain types of lymphoma. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 13.05. At the administrative hearing before the ALJ, Berset's counsel suggested that Berset did not meet Listing 13.05 "per se" but that his combination of impairments "might equal that listing even today." (Tr. 54–55.) Berset's counsel also urged this argument in Berset's appeal to the Appeals Council. (Tr. 234.)

The ALJ did not identify Listing 13.05 or any other listing in his opinion. Rather, he explained his step 3 finding as follows:

> The objective medical evidence fails to establish that the claimant's impairments, either individually or in combination, met or equaled the required severity of any section of the Listing of Impairments. In reaching this finding, I considered the opinions of State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion.

(Tr. 20.) The ALJ then described the evidentiary summaries prepared by the state agency physicians in this case. (Tr. 21, 792, 805, 822.) Although the ALJ accurately described the state agency physicians' summary of the evidence, he was mistaken when he found that the physicians evaluated medical equivalence at step 3.

When an ALJ finds that an individual's impairments are not equivalent in severity to any listing, "the requirement to receive expert opinion evidence into the record may be satisfied by [a

6

Disability Determination and Transmittal Form] signed by a State agency medical or psychological consultant." SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996). The records in this case contain two Disability Determination and Transmittal Forms signed by state agency physicians Moira Dolan, M.D., and Kavitha Reddy, M.D. (Tr. 59–60.) However, the code listed on these forms indicates that Dr. Dolan and Dr. Reddy did not perform a step 3 assessment because they found that Berset was not disabled at step 2. *See id.* (listing code F2); Soc. Sec. Admin., *Policy Operations Manual System* § DI26510.045 [hereinafter *POMS*], *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0426510045 (explaining that code F2 indicates a finding of non-disability due to lack of a severe impairment); 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step."). Other forms completed by Dr. Dolan and Dr. Reddy also indicate that they never assessed medical equivalence. (Tr. 792, 822.) These forms show that Dr. Dolan and Dr. Reddy issued a "technical denial," which is a denial issued for non-medical reasons, such as a claimant's failure to meet insured status requirements or desire not to pursue the claim. *Id.*; *see POMS* § DI 11010.075, *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0411010075.

For the foregoing reasons, the Disability Determination and Transmittal Forms signed by Dr. Dolan and Dr. Reddy do not satisfy the requirement for an expert medical opinion regarding equivalence. The record does not indicate and the Commissioner does not argue that the ALJ met this requirement using alternative means, such as calling a medical expert to testify at the administrative hearing. *See* SSR 96-6p, 1996 WL 374180, at *3–4 (July 2, 1996).

Having determined that the ALJ erred procedurally at step 3, the court "must still determine whether this error was harmless." *Audler*, 501 F.3d at 448. "Procedural perfection is not required

as long as the substantial rights of a party have not been affected." *Id.* (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)) (internal quotation marks omitted). An ALJ's procedural error at step 3 affects a claimant's substantial rights when the claimant appears to have met his burden of demonstrating that he meets or equals an impairment listed in the regulations governing Social Security claims. *See id.* at 449 (holding that ALJ's error affected claimant's substantive rights because claimant "would appear to have met her burden of demonstrating that she meets the Listing requirements for § 1.04A").

A claimant's impairment is medically equivalent to a listing if it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). "The claimant must provide medical findings that support each of the criteria for the equivalent impairment determination." *Selders*, 914 F.2d at 619. Specifically, the symptoms, signs, and laboratory findings of the claimant's impairment must be equal in severity to the symptoms, signs, and laboratory findings of a listed impairment. 20 C.F.R. § 404.1529(d)(3).

A claimant meets Listing 13.05 of the regulations governing Social Security claims if he has indolent non-Hodgkin's lymphoma "requiring initiation of more than one antineoplastic treatment regimen within a consecutive 12-month period." *Id.* Pt. 404, Subpt. P, App. 1 § 13.05(A)(2). According to the regulations, antineoplastic therapy "means surgery, irradiation, chemotherapy, hormones, immunotherapy, or bone marrow or stem cell transplantation." *Id.* § 13.00(B)(3). The regulations also instruct that an ALJ must consider the origin of the malignancy; extent of involvement; duration, frequency, and response to therapy; and effects of any post-therapeutic residuals when evaluating a claimant under this listing. *Id.* § 13.00(B).

The records in this case show that Berset was diagnosed with indolent non-Hodgkin's

8

lymphoma and that he initiated two antineoplastic treatment regimens—CHOP and Rituxan—within a consecutive 12-month period. (Tr. 497–98, 515, 521.)[1] Medical records show that Berset began CHOP on January 20, 2004, and underwent chemotherapy approximately every three weeks through June 22, 2004. (Tr. 498, 500, 502, 505, 509–10, 513, 515, 518.) The records reflect that Berset then received his first Rituxan treatment on July 7, 2004, less than seven months after he initiated CHOP. (Tr. 521, 760.) According to the records, he received Rituxan intermittently through April 19, 2006. (Tr. 521–27, 869–79.) During this period, gaps between treatments ranged from one week to almost six months. (Tr. 869, 871–72.)

The records indicate that Berset received Rituxan as maintenance therapy, that is, at a "systematic dosage at a level that maintains protection against exacerbation." (Tr. 454, 869, 872); *Stedman's Medical Dictionary* 1975 (28th ed. 2006). Regulations explain that an impairment will not meet the requirements of Listing 13.05(A)(2) if therapy is changed for a reason other than "a failure to achieve stability." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 13.00(K)(1)(b). For this reason, Berset's lymphoma does not meet 13.05(A)(2), since his disease remained stable and even improved prior to starting Rituxan. (Tr. 402–03, 406, 509, 511, 516, 519, 537.)

However, disease stability does not resolve the question of medical equivalence to Listing 13.05(A)(2). Rather, the regulations instruct that when a claimant's "disease has been stabilized," an ALJ must "assess severity based on the extent of involvement of other organ systems and residuals from therapy." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 13.00(K)(1)(a). The record contains

---

[1] CHOP is an acronym for a chemotherapy regimen composed of four different drugs. *Stedman's Medical Dictionary* 370 (28th ed. 2006). Rituxan (also called Rituximab) is "in a class of medications called biologic antineoplastic agents." *Rituximab injection*, PubMed Health (March 1, 2010), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000388/.

ample evidence that Berset experienced residual effects from his cancer treatments, including hair loss, fatigue, progressive paresthesias, urinary frequency and difficulty, hot flashes, nausea, vomiting, headaches, dizziness, left lower quadrant pain, leg aches, and a cough. (Tr. 500, 509, 513, 516–19, 524, 541–42, 877, 879.) The records also show that Berset's lymphoma involved multiple organ systems. (Tr. 407–08, 497, 533, 535–38, 541–42.) Furthermore, the records reflect that he experienced symptoms from acute prostatitis, acute bronchitis, asthma, sinusitis, bulging discs, and carpal tunnel syndrome during the period that he was undergoing cancer treatments. (Tr. 374–76, 508–10, 579–85, 640–42, 644–47, 819, 1056–57, 1061–62, 1067–69.) Absent some explanation from the ALJ as to why this evidence does not demonstrate that his combination of impairments was equivalent in severity to Listing 13.05(A), Berset appears to have met his burden of demonstrating equivalence to Listing 13.05(A). Accordingly, his substantial rights were affected by the ALJ's failure to obtain an expert medical opinion regarding medical equivalence to a listing. *See Audler*, 501 F.3d at 449.

A final point bears mention. A claimant must satisfy the "duration requirement" to be found disabled at step 3. 20 C.F.R. § 404.1520(d). If Berset could not meet the duration requirement, any procedural error by the ALJ would be harmless because the error would not "cast into doubt the existence of substantial evidence to support the ALJ's decision" that Berset was not entitled to benefits. *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).

To meet the duration requirement, a claimant "need only show that an alleged impairment has lasted or can be expected to last for the 12 month period[.]" *Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986). A claimant need not show that his impairment was so severe that it prevented him from working for twelve continuous months; "it is the impairment only which must last for a

continuous period." *Id.*

In this case, the ALJ found that Berset's lymphoma did not meet this requirement because it "was successfully treated within one year of diagnosis." (Tr. 24.) However, Berset's lymphoma was first noted by Dr. Martinez to be in complete remission on January 19, 2005, based on CT scans taken more than one year after Berset's diagnosis. (Tr. 340–42, 526, 530.) Furthermore, just as a claimant's disability onset date may precede the date of available clinical test results, so may the onset date of an impairment precede its official diagnosis date. *See Ivy*, 898 F.2d at 1048–49 (holding that claimant's disability onset date preceded date that her disabling impairment was first documented by laboratory findings and test results); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 13.00(J) (instructing that evidence can "establish the existence of a disabling impairment prior to the date of the evidence that shows the malignancy satisfies the criteria of a listing"). Although medical evidence is central to the determination of onset, acceptable medical evidence "includes observations made by a physician during physical examination and is not limited to the narrow strictures of laboratory findings or test[] results." *Ivy*, 898 F.2d at 1048–49. "The critical date is the actual onset of the impairment, not the date of diagnosis." *Dunn-Johnson v. Comm'r of Soc. Sec. Admin.*, No. 3:10-CV-1826-BF, 2012 WL 987534, at *10 (N.D. Tex. March 22, 2012). In this case, uncontradicted medical records reflect that Berset's first malignant mass presented approximately six months prior to his official lymphoma diagnosis. (Tr. 277–78, 1073–74.) For the foregoing reasons, substantial evidence does not support the ALJ's conclusion that Berset's lymphoma did not satisfy the duration requirement.

Even if the ALJ were correct regarding the duration of Berset's lymphoma, his finding regarding lymphoma alone does not preclude Berset from satisfying the duration requirement. When

a claimant has two or more impairments that are severe in combination, an ALJ "must also determine whether the combined effect of [the] impairments can be expected to continue to be severe for 12 months." 20 C.F.R. § 404.1522(b). Nothing in the record indicates that the ALJ made any such determination in this case.

## Conclusion

For the foregoing reasons, this court recommends that the United States District Court **REVERSE** the Commissioner's decision and **REMAND** this case for administrative proceedings consistent with this opinion.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2012); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996), *superceded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

Dated:        July 30, 2012.

                                    _____
                                    NANCY M. KOENIG
                                    United States Magistrate Judge